HOUSTON & TEXAS CENTRAL RAILROAD COMPANY v. E. E. ALEXANDER ET AL.

No. 1947. Decided June 9, 1909.

**1.—Master and Servant—Assumed Risk—Statutory Rule.**

By the Act of April 24, 1905 (Laws 29th Leg., p. 386), a servant having knowledge of a defect in the appliances furnished him by the master does not assume the risk arising therefrom where a person of ordinary care would have continued in the service with knowledge of the defect and danger. Charge held not erroneous under this rule; requested charge held properly refused, because ignoring it. (Pp. 503-505).

**2.—Same—Comparative Care of Master and Servant.**

The fact that a servant of ordinary care would have continued to use the appliance with knowledge of the defect and danger is not conclusive that the master was guilty of no negligence in so maintaining it. Ordinary care only is demanded of either; but what constitutes such care varies according to the situation of the parties, and may require more diligence of the master than of the servant. (P. 505.)

Vol. CII, Supreme—32.

Questions certified from the Court of Civil Appeals for the Fifth District, in an appeal from Grayson County.

*Baker, Botts, Parker & Garwood,* and *Head, Dillard, Smith* and *Head,* for appellant.—Where an employe has notice that the tools or appliances of the employer are generally of a certain kind, and kept in a particular condition, he assumes the risk of injury from tools or appliances of that kind and in that condition, although he may not have noticed that the particular tool or appliance which caused the injury is, at the time of the injury, of such kind or in such condition. Railway v. Somers, 71 Texas, 700; Railway v. Somers, 78 Texas, 439; Greene v. Eddy and Cross, 79 Texas, 130.

If Alexander had notice of the general condition of the tops of the oil boxes on defendant's engine, and it was negligence for defendant to have them in such condition, it would, of necessity, be contributory negligence on the part of said Alexander, with such knowledge, to attempt to use them in that condition. Texas & P. Ry. Co. v. Bradford, 66 Texas, 737; Texas Cent. Ry. Co. v. Lyons, 34 S. W., 364; Railway Co. v. Crawford, 89 Texas, 92; Trinity & B. V. Ry. Co. v. Perdue, 45 Texas Civ. App., 659.

An employer is only required to furnish, for the use of his employes, tools and appliances of the usual and ordinary form and shape, and keep them in the usual and ordinary condition, and is not guilty of negligence if he does this, notwithstanding injury may result to the employe therefrom; and especially is this true where, as in this case, there is no allegation or proof of the existence or use elsewhere of tools or appliances for the same purpose of a different kind, kept in a different condition. Chicago G. W. Ry. Co. v. Egan, 159 Fed., 40.

*John H. Sharp* and *J. H. Wood,* for appellee.—Special charge No. 10 required the jury to find for appellant if it was guilty of habitual negligence in allowing its box lids on its tool chests on locomotives to become covered with oil and to be and remain in a slippery condition, knowing that they were used as steps in ascending its said locomotives for the purpose of putting oil in same. Alexander did not assume the risk of habitual negligence upon the part of appellant in said respect. Houston & T. C. R. R. Co. v. Turner, 99 Texas, 547; Texas & P. Ry. v. Archibald, 170 U. S., 665; Hamilton v. Des Moines, etc., Ry., 36 Iowa, 31.

Said special charge is not correct in that it eliminated the proposition as to whether said deceased knew of the danger in continuing said work under said conditions. Railway v. Lehmberg, 75 Texas, 67; St. Louis & S. F. Ry. v. Doyle, 25 S. W., 461; San Antonio & A. P. Ry. v. Engelhorn, 24 Texas Civ. App., 324; Galveston, H. & S. A. Ry. v. Hughes, 22 Texas Civ. App., 134; 4 Thompson on Negligence, sec. 4627.

Said special charge is upon the weight of evidence, in that it required the jury to find for the appellant in the event he knew of the general condition of appellant's locomotives in this respect, and continued in its said employment, without regard to whether a man

of ordinary care would have continued in said employment. Act of April 24, 1905.

Referring again to authorities cited by appellant, and especially the Bradford case (66 Texas, 737), Lyons case (34 S. W., 364), and Crawford case (89 Texas, 92). It is our contention that the doctrine there laid down is modified by the statute on assumed risk (Acts 1905, p. 386). It seems clear from the statute that it is always a matter to be submitted to the jury as to whether or not a person of ordinary care would have continued in the employment of the master, with knowledge of defect and danger. However, we think these cases show a state of facts in which the servant is precluded from recovery, on the ground that the danger was so open and obvious that the courts held as a matter of law, that no person of ordinary care would have continued in the service; and if he did continue, he conclusively assumed the risk. The bare fact that the servant knew of the defect and danger does not, as a matter of law, make him assume the risk. If so, the statute is meaningless.

MR. JUSTICE BROWN delivered the opinion of the court.

Certified question from the Court of Civil Appeals of the Fifth Supreme Judicial District as follows:

"Appellees sued to recover of appellant damages for the death of Joe E. Alexander, the husband and father of appellees, alleged to have resulted from the negligence of appellant.

"On the night of November 8, 1906, Joe Alexander was in the employ of appellant and was engaged in supplying one of its oil burning locomotives with oil at Sherman. Alexander had been for some time engaged as car inspector, but for two months just preceding the accident had been engaged in supplying engines with oil.

"The testimony of Martin, fireman, is as follows: 'It was a rather dark night, but not rainy. It was a dry night. We stopped at said oil tank to take oil. Joe E. Alexander put oil in the tender of our engine. I had taken the cap off of the manhole before we got to the oil tank. Then Joe E. Alexander climbed up on the tender, pulled the spout down and gave oil through this manhole. Then, after he raised the spout, he placed the cap back on the manhole, and would screw it down when we got into Sherman, but this night spoken of I screwed it down because he was hurt. After he had oiled the engine he stepped down from his position on to an oil box where we kept cans of oil, and slipped and fell to the ground. He slipped and fell from the oil box. He fell about ten feet to the ground. As Mr. Alexander stepped down from the front part of the oil tank he had to step on the oil box mentioned just now, which was greasy, causing him to slip. His feet flew out from under him, and he fell to the ground. This oil box is made sloping so as to shed water when it rains; sloping two ways. Shortly after the accident I saw where he slipped. His shoe tacks had scratched and left marks on the box. This box upon which a man would step in coming down off the oil tank, was on the side, near the front end of the tender. It was made sloping so as to turn water, and was greasy from being tracked over by feet with the fuel oil on them. I saw

Mr. Alexander fall from the tender. He fell from the box on which we kept the oil cans. I looked at the box and all around soon after. This is a wooden box for keeping cans of oil, with the top made sloping to turn water. It was greasy with oil. I saw the box just before we reached the oil station, when I unscrewed the cap, and saw it again just after Mr. Alexander was hurt, when I screwed the cap on. Joe Alexander was not on or about said locomotive at any time that day previous to the time when he got hurt. I know that because he was at Sherman and this engine came in from the south. He threw the oil spout around himself before he started down. It was none of my duty to do this, or help do it. He stepped down on the box carelessly and his foot slipped. I shut the oil off below, after he fell, and locked his door in the enclosure for him; that is, the door of wall around tank. At the time Alexander fell, nothing had been said between Engineer Manning and Alexander, as we were waiting for Alexander to come down. Manning said nothing to him that night, before he fell, that I remember of. If they had any conversation before he fell I have no recollection of it. Manning did not direct him, or tell him anything about taking the oil, or how to take it, or anything that night. The engineer had no charge or direction of taking oil that night. All he had to do was to place engine at proper place. He had no charge or control of Alexander that I know of. I don't see where the engineer would have anything to do with, or charge of, taking oil. . . . I saw the place where Alexander fell from. He stepped on the slope or lid of the tool box. The print of the shoe tacks were on the top or slope. I have taken oil some, not very much experience. Alexander was standing at the proper place while taking oil. He did not fall while taking it. It was after he was through, and was coming down. He had walked on the tank from where he threw the spout up until he got to where he stepped down on the tool box. The way Mr. Alexander was doing the work, at the time he was injured, did not differ in any respect from the way he had been in the habit of doing it previous to said time. He did it in the same old way. . . . The tool boxes on defendant's engines generally are situated one on each side of the oil tank, on top of the water tank, bolted there between the oil tank and flange of water tank, nine or ten feet from the ground. They are up against the oil tank. They fill up the space between the oil tank and the outer edge of the tender. They get up and down with oil on their feet, and then sometimes the oiler runs the tank over a little, and sometimes, on rough track, the oil may slush out through the gas or air pipes at the top of tank or about the manhole.'

"Manning, engineer, testified: 'My run was between Ennis and Denison that night. I remember taking oil at Sherman on that night. I was hauling a passenger train. I took charge of that train at Ennis. I was the engineer on that train at that time, from Ennis north. When I took charge of the engine it was at the passenger depot at Ennis, hooked up ready to go. I did not take oil any time after I took charge of that engine until we arrived at the Sherman yards. That is the occasion that Alexander fell off the engine. I

was there, present at that time.  I was the engineer in charge of the engine that night.  J. B. Martin was my fireman.  I saw that box after Mr. Alexander fell.  I examined it after we got up here in the yards, after we got to the passenger depot.  The place where he was hurt was about a mile and a half, I suppose, from the passenger depot.  I am not sure, but it is something like that.  I suppose it would be about fifteen or twenty minutes after he was hurt before I examined the box on which he slipped; not over that.  A man in performing Alexander's duties gets up and down off the engine this way:  He first gets up between the engine and tender; and then he turns and goes up on the tender, generally on either side.  Both sides are just the same.  They have got a box like this on either side.  This was an oil box that we kept our lubricating oil in, and on the other side, the right-hand side, there is a box that we keep our tools in, hammers, etc.  He climbs up on the end of the tank and steps on the box, and from the box onto this oil tank.  There are other ways for him to get up and down off of the oil tank without passing over that box.  He could get up different ways, I suppose, but I would think that would be the handiest way, and that is the way that is usually used.  He always used that, and all the rest.  I don't believe I have ever known of anybody else using any other way.  That is the usual way.  He would pass over that box both going up and coming down.  This is the box in which we keep our lubricating oil.  It is usual for the top of that box to have grease and dirt and oil on top of it.  It gets an accumulation of dust and dirt, and we sweep it off; sometimes the wind blows it off.  The box would naturally get that way from the natural uses; the same as the top of a coach, or any other place, or any other box.  It would accumulate dirt and grease from various causes.  It does do it, will do it, and will always do it.  I guess the box is about five feet from the hole in which the oil is run into the oil tank.  It is lower than the hole, and is about two feet lower than the top of the oil tank.  It was in its ordinary condition when I examined it.  All the lights were burning.  We had an incandescent light on top of the cab like you see in that picture, with a reflector, reflecting back over the tank, and Mr. Alexander also had his light.  His light also had a reflector.  I think the light he had is a special made light.  It is a lantern with a reflector around it, and he set it right up there (on top of the cab top) opposite that incandescent light on the cab, after he got up there.  They were both lighted and burning, because I took his light down afterwards.  I took his light down after he got hurt.  According to my recollection, Mr. Alexander had been doing that particular kind of work something over two months.  I think it was something over two months.  I don't think there had been any material change in the way of doing that work during that time; no change. . . . There had been no change in the way of doing the work that Mr. Alexander was doing at the time he was hurt upon the engine.  That is the same.  There had been no change during the time he had been doing the work.  I did not say a thing to Mr. Alexander that night, in reference to doing the work; not a word.  I did not hurry him up.  Not a word was spoken, only he spoke

'Good evening,' 'How do you do?' or something when he got up on the tank—'Are you here?' or something like that, when he got up on the tank. I am still in the employ of the company. I have been in the company's employ about 29 years. I did not see any fresh oil on that box. I saw dirt, accumulation, and I saw grease on both sides of it. That grease looked to have been on there some time. The top of the oil tank is about two feet above the tool box. A man putting oil in, in coming down would travel toward the front of the engine from the highest point of the tender until he got even with the tool box, and step down on the tool box and then down on the outside of the tender and then into the cab. That was the proper way to go. I am positive that no oil got on that box after it left Ennis that night. The oil and grease that was on it was there before that time. I knew it was there, just like it was, before that time. The top of that box gets in that condition, greasy, about the second trip you make after she comes out new. I didn't particularly know the box was in that condition. I knew it was up there, and knew it was slick. I never did notify the company. The company has inspectors at Ennis to go over it at Ennis. That engine was inspected before I took charge of it at Ennis. There is no difference in the various passenger engines, in reference to the manner of giving oil, or with reference to that oil box. I said, in answer to Judge Wood's question, that the oil box, this oil box, would get in the condition it was somewhere about the second trip that it would make. It would get just that way very soon and remain that way. If there was any loose oil on it we would wipe it off.'

"By another witness it was shown that Alexander oiled an engine every night, if there was one to oil, and sometimes he would oil more than one in a night, and that all of the engines were similarly constructed.

"Ross McMinn testified as follows: 'As night hostler I have the engines cleaned. I do not have that box cleaned off. Very seldom have that touched because we haven't got time. I never did have that cleaned off while I was up there. I never got time to do that at night because the hours are so short we didn't have time. I don't know anything about whether they did in the daytime or not. So far as I was concerned, I never had that cleaned off at all. The reason I didn't was because we did not have time. The fact about the matter is we hardly ever visit that place only to measure oil. I never did it because I didn't have time to do it. Yes, it would matter to me how greasy it got. We never undertook to clean it off because we would have had to have more men to do it. It would make the box slippery and greasy if there was oil on top of it, and makes it dangerous for a man to get on. More or less grease, there is bound to be more or less danger. The way we always went to get up on the tank was to go right over that box. That is the most practical way. The company had no other arrangements. I went that way myself lots of times. They had no other way to get on the tank. The box was a necessary step to get on top of the tank. I never measured the height of the box, but I presume it was twelve or maybe eighteen inches high. By getting on that it would bring

you in about two feet of the top of the tank. You could not step up on the tank very easily without stepping on the box. There was more or less grease all over the top of the box. I could not say whether it was fresh grease or not, because there was dust amongst it—dirt accumulated there. I could't tell whether it was fresh or not. I never cleaned the oil off at all in Denison. I did in Ennis. In Ennis they do clean them off. Sometimes they wipe off the tool boxes and all the top of the tank. They had time to do it in Denison, but not the force.'

"The court's charge on assumed risk was as follows: 'When the deceased, Joe Alexander, entered the employment of the defendant, he assumed all the risks of danger ordinarily incident to such employment, but he did not assume any danger or risk arising from the negligence, if any, of the defendant, unless he know of such negligence and attendant danger, or, in the ordinary performance of his duties, would have necessarily acquired knowledge thereof, in time to have avoided injury therefrom. Plaintiff had the right to assume that defendant would perform its duty of exercising ordinary care for the safety of its employes.' In paragraph seven the charge, among other things, charged as follows: 'Or, if you believe from the evidence, that on the occasion in question that deceased knew of the condition of the top of said oil box, or knew that it was likely to become in a slick and slippery condition from the oil, . . . you will find for defendant.'

"The appellant requested a special charge No. 10, which was refused by the court, as follows: 'The master or employer has the right to select and use such instrumentalities and appliances in carrying on his business as he may deem proper, provided only that the servant or employe, before he receives injury therefrom, has notice of the kind of instrumentalities and appliances he is to use in discharging his duties, and continues in the employment with such knowledge, and it is not necessary that an employe should have actual knowledge of the nature of any particular tool or appliance, provided he has notice that the tools or appliances of that kind which he is expected to use are generally of the kind and condition as the one in question. Therefore, if you believe from the evidence that Joe E. Alexander, before he was injured, had notice that the boxes of the kind in question, in general use upon defendant's engines, were of similar construction, and kept in similar condition as the one upon which said Alexander slipped, and with such notice continued in such employment, you will find for the defendant.' The refusal of this charge is assigned as error.

"Question 1. Under the circumstances did the court err in refusing special No. 10, above quoted?

"Question 2. Was said requested charge erroneous in not submitting the question, whether or not Alexander appreciated the danger of the then existing condition, etc.?

"Question 3. Was said special charge substantially covered by the court's main charge, as above set out?"

The trial court did not err against appellant by giving the charge

certified, nor by refusing the charge requested by the railroad company.

The injury which caused the death of Alexander was inflicted upon him on the 8th day of November, 1906, therefore the issue of assumed risk is governed by the Act of the Legislature approved April 24, 1905. (Laws 29th Leg., p. 386.) We copy as follows:

"Section 1. That in any suit against a person, corporation or receiver operating a railroad or street railway for damages for the death or personal injury of an employe or servant, caused by the wrong or negligence of such person, corporation or receiver, that the plea of assumed risk of the deceased or injured employe where the ground of the plea is knowledge or means of knowledge of the defect and danger which caused the injury or death shall not be available in the following cases:

"Second. Where a person of ordinary care would have continued in the service with the knowledge of the defect and danger and in such case it shall not be necessary that the servant or employe give notice of the defect as provided in subdivision 1 hereof."

The statute did not abolish the rule of the law that one who enters the service of a railroad company assumes all risks which are ordinarily incident to his employment, also the risks which are known to him or that he should discover in the proper discharge of his duties. The effect of that act is to deny to the railroad company the defense of assumed risk in case "the defect or danger" which caused the injury was such that a person of ordinary prudence under like circumstances "would have continued in the service." The change is favorable to the employe, which we can not explain better than to contrast its application with the previous rule as heretofore applied.

In Galveston, H. & S. A. Ry. Co. v. Drew, 59 Texas, 10, a locomotive without a pilot was ordered to be sent out upon the road. The engineer who was to serve upon it objected because of the want of a pilot and the danger of using it in that condition. The railroad official who had directed the sending out of the locomotive informed the engineer that if he would not take it out he, the officer, would get some one who would do so. The engineer interpreted this language to mean that he must either take the risk or lose his position, and he chose to take the risk. On the trip the locomotive ran over a cow and was thrown from the track, thereby seriously injuring the engineer. In a suit for damages against the railroad company it was pleaded that the servant assumed the risk because he knew the danger before he started on the trip and therefore could not recover. This court held that to be the law and reversed the judgment of the lower court and rendered judgment for the railroad company. If such case were tried under the present statute the servant would have the right to show that the condition of the locomotive and the circumstances were such that a prudent man situated as he was would have used the locomotive as he did. This contrasting of the two rules as applied to the same facts serves to give a better interpretation of the statute than any discussion that we might make.

Counsel for the appellant asserts that if the box on the tender

in -this case was in such condition that a man of ordinary pru-
dence would have used it that fact necessarily acquits the railroad
company of negligence because the company was only required to
use such care as a man of ordinary prudence would use in furnishing
machinery for the use of the employe.   In making this assertion
counsel has overlooked the fact that the same degree of care does not
necessarily imply the same quantum of diligence to be used.   In
some instances ordinary care requires the exercise of great diligence
while in other cases the exercise of the same degree of care demands
but slight diligence.   For instance, the railroad company is only
required to exercise ordinary care in selecting, furnishing and keep-
ing in repair its locomotives and is required to use the same degree
of care in selecting and furnishing a brakeman with his lantern,
but the diligence which is required of the company in the two cases
is different in a very marked degree and is determined by the char-
acter of the things to be furnished and the danger involved in their
use.   Again, the railroad employes operating a train are required to
use ordinary care to prevent injuring a person whom they may see
upon the track when it appears that such person will not or can
not get off the track and out of danger, yet the diligence required
of such servants is that they must use every means in their power
and at their command, consistent with the safety of the train, to
prevent injuring the person thus situated.   Ordinary care on the
part of the master in selecting the tools to be used demands a
greater amount of diligence than is required of the servant under
the late act in using the same.   The master has full opportunity
to examine, repair and make sure of the safe condition of the im-
plement before it is put in the hands of the servant, while the latter
must take it as it comes to him, oftentimes act upon the spur of
the moment without opportunity for examination.   It would be im-
practicable for the servant to stop and examine each piece of ma-
chinery and each implement furnished to him for his use.   The
purpose of the law under consideration was to secure the servant
against the injustice of being denied reparation for injuries which
he received while in the faithful performance of his duties and aris-
ing. out of the circumstances and conditions over which he could not
possibly have control, and under circumstances which would authorize
him in the exercise of ordinary case to continue in the service by
using the defective machinery or implements.