SCHAFF v. HENDRICH. (No. 8933.)

(Court of Civil Appeals of Texas. Ft. Worth. Dec. 14, 1918.)

1. MASTER AND SERVANT ☞280—ACTION FOR INJURIES—EVIDENCE—ASSUMED RISK.

Evidence *held* to show that railroad employé, injured while working in roundhouse pit by reason of slippery condition of pit bottom, knew of such condition and realized risk of slipping and falling by reason thereof in performance of his duties.

2. COMMERCE ☞8(6)—STATE STATUTES—INTERSTATE COMMERCE—ASSUMED RISK.

State statutes abrogating defense of assumed risk are inapplicable to actions for injuries to railroad employés engaged in interstate commerce, federal statutes and decisions governing.

3. MASTER AND SERVANT ☞204(1)—ASSUMED RISK—FEDERAL EMPLOYERS' LIABILITY ACT.

Federal Employers' Liability Act has not abrogated the defense of assumed risk under the common law.　·

4. MASTER AND SERVANT ☞226(1)—ASSUMED RISK—RAILROAD EMPLOYÉ.

Railroad employé engaged in interstate commerce assumes all ordinary risks incident to employment, but not those arising from railroad's negligence.

5. MASTER AND SERVANT ☞217(10)—ASSUMED RISK—RAILROAD EMPLOYÉ.

Railroad employé engaged in interstate commerce, knowing that machinery is defective, or that place of work unnecessarily dangerous, or that proper rules are not enforced, assumes risk thereof, unless he informs employer, who promises to correct conditions.

---

☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Irdexes

6. MASTER AND SERVANT ☞288(14)—ASSUMP-
TION OF RISK—PROMISE TO REMEDY CONDI-
TIONS.

In railroad employé's action for injuries sus-
tained while engaged in interstate commerce, de-
fended on ground of assumption of risk, fore-
man's statement, "Well, I will see," was insuffi-
cient as matter of law to sustain finding of a
promise to repair defective condition.

7. MASTER AND SERVANT ☞263 — ASSUMED
RISK—PLEADING.

Employé, suing for injuries and seeking to
avoid employer's defense of assumed risk by em-
ployer's promise to remedy conditions, must spe-
cially plead such promise.

Appeal from District Court, Wichita Coun-
ty; W. N. Bonner, Judge.

Action by E. P. Hendrich against C. E.
Schaff, receiver of the Missouri, Kansas &
Texas Railway Company of Texas. Judg-
ment for plaintiff, and defendant appeals.
Reversed and rendered.

Martin, Bullington, Boone & Humphrey,
of Wichita Falls, for appellant.
Nicholson & Fitzgerald, of Wichita Falls,
for appellee.

DUNKLIN, J.   C. E. Schaff was duly ap-
pointed receiver of the Missouri, Kansas &
Texas Railway Company of Texas by the
United States District Court of the Northern
District of Texas, and under and by virtue
of the orders of that court he operated the
railway of that company, and also that of
the Wichita Falls & Northwestern Railway
Company of Texas, which latter line had
been leased by the railway company first
mentioned.

On January 2, 1917, E. P. Hendrich, as an
employé of the receiver, was working in the
roundhouse of the Wichita Falls & North-
western Railway Company of Texas, in the
city of Wichita Falls, in the capacity of
foreman of a tank gang, the duties of which
gang included the work of removing wheels
from tanks or tenders of locomotives and
replacing them with new ones.  In order to
perform that service the tank would be un-
coupled from the engine, then jacked up so
that the old wheels or trucks could be re-
moved and replaced with new ones.  This
work was done over a pit in the roundhouse,
spanned by the track over which the loco-
motive and the tank would be placed.  In
cleaning the locomotive by blowing it out
with steam, water would be discharged into
the pit, and in order to get rid of this wa-
ter a drainpipe was constructed, which led
off from the pit.   Prior to the accident here-
inafter related, this drainpipe had become
obstructed to such an extent that the floor of
the pit, which was covered with cinders, was
rendered wet and slippery to any one work-

ing therein in the discharge of the duties of
plaintiff's employment.

On or about the date mentioned above,
plaintiff and other members of his tank gang
undertook to replace the wheels of one of
the engine tanks with new ones, and prepara-
tory to so doing the engine and tank were
placed over the pit.  The tank was then un-
coupled from the engine and jacked up so
as to allow the removal of the wheels or
trucks thereunder for the purpose of re-
placing them with new ones.  While plain-
tiff was in the pit and assisting other em-
ployés in rolling out the old wheels after
the tank had been jacked up, and while push-
ing on the wheels in order to move them,
his foot slipped on the wet cinders in the
bottom of the pit, and as a result he fell,
his breast striking against the flange of one
of the wheels of the truck which he was
then moving.

Hendrich instituted this suit against the
receiver to recover damages for personal in-
juries which he alleged he sustained as a re-
sult of said fall, upon allegations that the
defendant was guilty of negligence in al-
lowing the bottom of the pit to become wet
and slippery, and hence had failed to dis-
charge his legal duty to the plaintiff to ex-
ercise ordinary care to furnish him a safe
place to work.  From a judgment in plain-
tiff's favor on a trial before a jury the de-
fendant has appealed.

One of the defenses urged by the receiver
was that at the time of plaintiff's alleged
injury he was engaged in duties incident to
interstate commerce, and that he could not
recover because he had assumed the risks of
his injury; but the finding of the jury upon
that issue was adverse to him.  That issue
was submitted to the jury in the court's
charge as a controverted issue of fact.

The first error assigned is to the refusal
of the defendant's request for a peremptory
instruction to the jury to find in his favor
upon that issue.

The proof showed without controversy that
the tank or tender upon which plaintiff was
working at the time of his alleged injury was
attached to engine No. 220 which, together
with the tender, was then, and had been for
some time prior thereto, used exclusively in
hauling passenger, baggage, and express
trains between Wichita Falls, Tex., and
towns in the state of Oklahoma; and that
such use of the locomotive and tender had
been known to plaintiff for more than two
years prior to the alleged accident.

[1] That plaintiff knew of the slippery con-
dition of the bottom of the pit and of the
risk of slipping and falling by reason there-
of in performing the services in which he
was engaged at the time of his alleged in-
jury was conclusively proven by his own tes-
timony.  He testified:  That he was first en-

gaged as one of the yard gang around the same roundhouse in the year 1912, during which year he frequently saw engines blow out steam and water into the pit. During the month of October, 1914. he went to work as a helper on the tank gang, which gang was doing the same work that was being done at the time of his alleged injury; and that he continued in that employment up to the date of the accident, having become foreman of the tank gang in the meantime; and that he was working on the tank of engine No. 220 at the time of the accident. He further testified as follows:

"On the 2d day of January, when I got hurt, I was putting in a new pair of wheels on the tank of this engine, I was doing this because the old ones were reported to be taken out. * * *

"Yes, sir; I had charge of that job, and I had exclusive control of all about it, and how to do it.

"Yes, sir; I did tell those men with me to take those wheels out and how to take them out, but I took them out according to instructions that I had from the foreman. Yes, sir; the foreman was there at the time; he was not right there at the place that I was working at that time, but I took the wheels out as I usually did. That ground had been slippery there as it then was for some four or five months; I had seen it there during that time; and that evening, when I started to work there to take those wheels out, I saw that the ground was slippery there, and I realized that that ground was slippery at that time. I had known that the drain that drained the pits had stopped up for some six or seven months, and I knew that at that time that I went to work that evening on these wheels, and at that time I knew why the water was out there on those cinders. Still I had not made any complaint to the foreman particularly about it. I had told him that it was wet; I told Varley, the foreman, that it was wet and sloppy, and that it made it slippery, but I did not tell Varley that exactly the day that I got hurt. Yes, sir; I had told Varley that the ground was slippery, I had told him that three or four days beforehand, before I got hurt.

"That place was slippery there all day long that day that I went to work on those wheels, the 2d day of January; and I knew that before I started to work that day, and I knew that it was in that slippery condition that day after dinner when I went to work there to take out those particular wheels. I knew that place was in that slippery condition at the time that I received my orders to do that work there. I knew at that time that it was slippery, and I never said anything to the foreman about it, not on that day; no, sir; but I did go ahead to work. As to whether I realized that I might slip there, will say that I had not studied about that at all. I had not slipped on that ground where it was slippery, not to amount to anything, before; but I had slipped there. At that time I might have known that I might slip again, before I went to work there that way. I do not know, could not tell the jury, how many times I had slipped on that ground there—I could not say. I have slipped there several times, but I have never hurt myself before. I could not give even an approximate answer as

207 S.W.—35

to how many times I had slipped and fallen there before, for I do not know.

"Yes, sir; I had taken off wheels just like that before, and I had never hurt myself on the wheels before. I fell a time or two, but I never hurt myself, that is, not on the wheels; I had not before fallen on the wheels while working on the wheels, but on other work, while I was using the pinch bar, or pry bar, something like that.

"My slipping and falling and striking my breast on the flange of the wheel was caused by the wet ground there; that is what caused me to slip.

"Yes, sir; I had removed wheels there when the ground was dry and put in new wheels; and I had never slipped that way that I know of, when the ground was dry.

"Q. Then that condition around the pit was in no worse condition than it had been theretofore? A. Not particular, no.

"Q. You could see the ground there and the condition that it was in? A. Yes, sir.

"Q. It was not dark in there that day? A. No; it was day.

"Q. Was light? A. Yes, sir.

"Q. In plain view, big open doors there? A. Yes, sir.

"Q. Right there, a few feet from you? A. Yes, sir.

"Q. You could see the ground and the condition it was in? A. Yes, sir.

"Q. You could see that it was slippery on that day? A. Yes, sir.

"Q. You could see that it was slippery before you began to move those wheels? A. Yes, sir.

"Q. Still you went ahead and went on moving them; knowing that the ground was slippery and knowing that your feet were liable to slip, still you went ahead? A. Yes, sir.

"Q. And you knew that your feet were liable to slip in handling those wheels? A. Yes, sir.

"Q. And still in the face of that you did go ahead and did move them and slip? A. Yes, sir.

"As to having slipped on that ground before, will say that it is true that I had removed and put back a large number of wheels during the months that I had been working there, and I had never slipped or hurt myself before this time, in removing wheels. I had never seen anybody slip and hurt themselves during that time, either while rolling out wheels. I have seen fellows get hurt there of course, but I have never seen them get hurt removing wheels that I know of.

"As tank foreman of that company it was not part of my duty to see that the pits were kept free from water, and it was not a part of my duty to see that the ground around there where I had to work was in proper condition. I had nothing to do with that. I was supposed to tell the foreman if there was anything defective; they had a bulletin paper there that said 'Please notify your foreman.' Yes, sir; I told the foreman, Mr. Varley, that the pit was full, or partially full, of water, and that the drainpipe in the bottom was clogged up. I not only told him myself, but several others told him also. I know of my own personal knowledge that others told Mr. Varley about this pit not being drained. When I notified Mr. Varley about the condition of the pit, he simply said, 'Well, I will see,' and that is all the information that I got out of him. But when the foreman, Mr. Varley, told me that, I thought that he would fix it. At that time that

day that I went to roll those wheels out, I did not know, and I did not have any idea that I would get hurt by slipping on that ground."

[2, 3] It is well settled by the authorities that where the servant of a railway company is injured in the performance of a duty pertaining to interstate commerce, the state statutes, abrogating the defense of assumed risks under the common law, do not apply, but the federal statutes and decisions govern. It is also well settled that the federal Employers' Liability Act (Act Cong. April 22, 1908, c. 149, 35 Stat. 65 [U. S. Comp. St. 1916, §§ 8657–8665]) has not abrogated the defense of assumed risks under the common law, but that such defense is still applicable.

[4, 5] The common-law rule controlling in such cases was announced by our Supreme Court in T. & N. O. Ry. Co. v. Bingle, 91 Tex. 288, 42 S. W. 971, in the following language:

"The servant by entering the employment of the master assumes all the ordinary risks incident to the business, but not those arising from the master's neglect. It is the duty of the master to exercise ordinary care to furnish him a safe place in which to work, safe machinery and appliances, to select careful and skillful co-workers, and in case of a dangerous and complicated business to make such reasonable rules for its conduct as may be proper to protect the servants employed therein. The servant has the right to rely upon the assumption that the master has done his duty; but if he becomes apprised that he has not and learns that the machinery is defective, the place unnecessarily dangerous, or that proper rules are not enforced, he assumes the risk incident to that condition of affairs, unless he informs the master and the latter promises to correct the evil. In this latter event, so long as he has reasonable grounds to expect and does expect that the master will fulfill his promise, he does not by continuing in the employment assume the additional risk arising from the master's neglect. If he then be injured by reason of that neglect, he may recover, provided it be found that a man of ordinary prudence under all the circumstances would have encountered the danger by continuing in the service. This we understand to be the rule in the English courts. It is the rule in the Supreme Court of the United States, and is supported by the weight of authority."

For other decisions in which the common-law rule so stated was applied in cases where no question of interstate commerce was involved, see Texas & Pacific Ry. Co. v. Lewis, 133 S. W. 1086; Houston & Texas Central Ry. Co. v. Alexander, 102 Tex. 497, 119 S. W. 1135; G., C. & S. F. Ry. Co. v. Huyett, 99 Tex. 630, 92 S. W. 454, 5 L. R. A. (N. S.) 669; St. L. S. W. Ry. Co. v. Hynson, 101 Tex. 546, 109 S. W. 929.

For decisions holding that the common-law rule of assumed risk has not been abrogated by the federal Employers' Liability Act, but is applicable in cases where an employé seeks to recover for an injury while he is engaged in the handling of interstate commerce, see Freeman v. Powell, 144 S. W. 1033; T. & P. Ry. Co. v. White, 177 S. W. 1185; Seaboard Air Line Ry. Co. v. Horton, 233 U. S. 492, 34 Sup. Ct. 635, 58 L. Ed. 1062, L. R. A. 1915C, 1, Ann. Cas. 1915B, 475; Pedersen v. Railway Co., 229 U. S. 146, 33 Sup. Ct. 648, 57 L. Ed. 1129, Ann. Cas. 1914C, 153.

[6] It will be noted in the testimony of the plaintiff, set out above, that when he notified Mr. Varley, the foreman in charge of the roundhouse, of the accumulation of water in the pit, he simply replied, "Well, I will see," and that was all the information he received from Mr. Varley concerning the condition complained of. We conclude that such language used by Varley was insufficient as a matter of law to support a finding of a promise to remedy the slippery condition of the floor of the pit, and thereby to bring plaintiff's case within the exception to the general rule of assumption of risks, noted in the quotation from Railway Co. v. Bingle, supra. See, also, G., H. & S. A. Ry. Co. v. Drew, 59 Tex. 10, 46 Am. Rep. 261.

[7] Furthermore, plaintiff filed no reply whatever to defendant's plea of assumed risk by reason of plaintiff's knowledge of the slippery condition of the floor of the pit and of the risk incident thereto prior to and at the time he undertook to move the trucks, and there was no pleading of either party presenting the issue of any promise of the master to remedy the slippery condition of the pit, and that the plaintiff relied upon such promise, and was thereby induced to continue in the master's employment after knowledge of such dangerous condition of the pit. Such a promise would have been in the nature of a confession and avoidance, and it was plaintiff's duty to plead it if he intended to invoke relief by reason thereof. Further still, the trial court did not submit to the jury any issue to bring the case within the exception to the common-law rule, nor did plaintiff request the submission of such an issue, nor has he filed any briefs in this court suggesting any reason why the case would come within the exception noted.

In view of what we have said it follows that the assignment of error now under discussion should be sustained, and by reason thereof the judgment of the trial court should be reversed, and judgment should be here rendered in favor of the appellant without reference to other assignments, which, therefore, it will be unnecessary to discuss; and it is so ordered.

Reversed and rendered.